UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

LISA BENNETT, as Administratrix
of the Estate of ANN HALL,

            v.                           C.A. No. 07-163ML

KENT COUNTY MEMORIAL HOSPITAL;
MICHAEL QUAS, M.D.;
M. JAMES, R.N.;
JOHN AND JANE DOE, M.D., ALIAS;
JOHN AND JANE DOE, R.N., ALIAS;
JOHN DOE CORPORATION, ALIAS

## OPINION AND ORDER

Mary M. Lisi, Chief United States District Court Judge.

The question before this Court is whether the Rhode Island peer-review privilege, set forth in R.I. Gen. Laws §§ 23-17-25(a) and 5-37.3-7(c), applies in a medical negligence case in which the plaintiff has raised claims under the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, as well as Rhode Island state law claims. The plaintiff, Lisa Bennett ("Bennett"), as Administratrix of the Estate of Ann Hall ("Hall"), has appealed from a magistrate judge's order denying the plaintiff's motion to compel deposition testimony by the Director of defendant Kent County Memorial Hospital's Emergency Department where Hall received emergency-room care. For the reasons stated below, the appeal is denied and the magistrate judge's order is affirmed.

1

## Background and Travel

On May 8, 2005, at 2:30 p.m., 44-year old Hall arrived by ambulance at the Emergency Department ("E.D") of Kent County Memorial Hospital ("Kent") with complaints of diarrhea, headache, neck pain, and vomiting. Hall was initially seen by the triage nurse, who took Hall's vital signs and inquired about her current medications and past medical history. Next, Hall was examined by Dr. Michael Quas, who noted that Hall's symptoms had begun at 4:00 a.m. that morning and continued in the E.D.. Dr. Quas ordered a CBC (complete blood count), a Chem 7 (a basic metabolic panel), a chest x-ray, and EKG monitoring. Dr. Quas also prescribed Vicodin, Flexeril, and Motrin to be administered intravenously for pain, and Reglan for Hall's nausea. At that time, Dr. Quas hypothesized that Hall's symptoms might be caused by a viral illness resulting in dehydration and anxiety.

At 4:45 p.m., attending Nurse Matthew James ("James") recorded that, at that time, Hall only complained of neck pain. At 6:30 p.m., Hall's laboratory results were returned and she was again assessed by Dr. Quas. Dr. Quas, noticing that Hall was experiencing tremors, inquired whether she regularly consumed alcohol, and he prescribed additional medication to alleviate her tremors. At 7:30 p.m., Hall was discharged from Kent with a preliminary diagnosis of anxiety, fainting spell, and viral symptoms. Hall received a prescription for Flexeril along with

2

instructions to take liberal amounts of fluids; return if her condition worsened; and see her primary care physician for follow-up.

According to Kenneth Gammon, Hall's significant other, Hall appeared to suffer a seizure several hours after she arrived home and she was transported to Kent by rescue. A CAT Scan revealed that Hall was suffering from an acute subarachnoid hemorrhage.[1] Hall was transferred to Rhode Island Hospital where she died a day and a half later.

In May 2007, Bennett brought an 18 count complaint in this Court against Kent, Dr. Quas, James, John and Jane Doe, M.D. and R.N., and John Doe Corporation. In addition to state law claims of negligence and lack of informed consent asserted against all defendants, Bennett brought two claims against Kent pursuant to the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, for failure to provide appropriate medical screening to Hall and to stabilize her while she was in the Kent emergency room.

In the course of discovery, Kent submitted a privilege log that included a three page report by the Kent E.D. Physician Review Group (the "Review Group"), which had reviewed Hall's case and made certain findings regarding the standard of care she had received.

---

[1]
Bleeding in the area between the brain and the thin tissues that cover the brain. MedlinePlus Medical Encyclopedia.

Subsequently, Bennett took the deposition of Dr. Robert Dinwoodie, Chief of the Kent E.D., who also participated in the review of Hall's case and who drafted a summary of the Review Group's findings. As Bennett's counsel proceeded to question Dr. Dinwoodie regarding the standard of care applied to Hall's treatment, Kent's counsel raised an objection on the grounds that (1) Dr. Dinwoodie, as a non-treating physician, could not be compelled to provide expert testimony; and (2) the questions amounted to an inquiry about the findings by the Review Group, for which Kent had asserted the peer-review privilege.

On March 2, 2009, Bennett filed a motion to compel Dr. Dinwoodie "to answer questions concerning how department standards, for which Dr. Dinwoodie is responsible, were maintained prior to the death of the plaintiff and whether the care delivered to the decedent met those standards." Pl.'s Mot. Compel 2. Bennett argued that her deposition questions to Dr. Dinwoodie were "directly relevant to plaintiff's claim of corporate liability," id., and that she could not otherwise "discover the standards of an institutional defendant from an agent who had responsibility for maintaining those standards." Id. at 3. Kent renewed its objection and pointed out that Hall's medical records, which were examined during the peer-review process, had been made available to Bennett. Def.'s Obj. Mot. Compel 9. Kent also suggested that Dr. Dinwoodie's testimony regarding the standard of care in a

4

particular case was not relevant to the corporate liability claim.
<u>Id.</u> at 10-11.

At a hearing on the motion before the magistrate judge,
Bennett's counsel acknowledged that, if the peer-review privilege
were applicable, it would preclude her from questioning Dr.
Dinwoodie about what opinions he reached when participating in the
peer-review board, Mot. Hr'g Tr. 11:18-21, March 12, 2009, and she
agreed with the magistrate judge's characterization "you want to
ask Dr. Dinwoodie 'did Dr. Quas do what you expected of him.'"  <u>Id.</u>
at 16:12-13.   Kent, on its part,  maintained that Dr. Dinwoodie's
testimony was subject to the Rhode Island peer-review privilege and
that his testimony as a non-attending expert could not be
compelled.

Shortly after the hearing, Magistrate Judge Almond entered the
following text order:

> **TEXT ORDER denying   23 Motion to Compel. Plaintiff's
> Motion to Compel Deposition Testimony (Document No. 23)
> is DENIED. Plaintiff seeks to reconvene the suspended
> deposition of Dr. Robert Dinwoodie. Dr. Dinwoodie, the
> Hospital's Chief of Emergency Medicine, was not involved
> in the treatment of Plaintiff's decedent and thus has no
> first-hand knowledge of the patient care at issue in this
> case. Dr. Dinwoodie did, however, participate in a peer-
> review of such patient care and prepared a physician
> review form as part of such peer-review which is the
> subject of an unchallenged peer-review privilege claim by
> Defendants. At the hearing, Plaintiff's counsel described
> the disputed area of inquiry and, when you boil it down,
> she basically seeks to pose a hypothetical question to
> Dr. Dinwoodie based on the facts of this case to elicit
> his opinion as to the treating physician's adherence to
> the applicable standard of care. Plaintiff's attempt to**

5

compel an "expert" opinion from Dr. Dinwoodie regarding the treating physician's care is not permissible under Rhode Island law, <u>Sousa v. Chaset</u>, 519 A.2d 1132, 1136 (R.I. 1987), and is precluded by the peer-review privilege, R.I. Gen. Laws §§ 23-17-25(a) and 5-37.3-7(c). So Ordered by Magistrate Judge Lincoln D. Almond on 3/12/09. (Noel, Jeannine) (Entered: 03/13/2009)

From this order, Bennett has filed a timely appeal to which Kent has objected.

## Standard of Review

Pursuant to Fed. R. Civ. P. 72(a), in an appeal from a magistrate judge's order on nondispositive matters, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72 (a). "A determination is 'clearly erroneous' when, although there is evidence to support it, the court, after reviewing all the evidence, is left with the definite and firm conviction that the magistrate judge made a mistake." <u>Harvard Pilgrim Health Care of New England v. Thompson</u>, 318 F.Supp.2d 1, 6 (D.R.I. 2004).

## Analysis

In her appeal, Bennett asserts, for the first time, that Fed. R. Evid. 501 is applicable to her EMTALA claim and that the magistrate judge erroneously relied on state statutes and state common law in determining that Dr. Dinwoodie's testimony was

protected by the peer-review privilege.[2]  Pl.'s Mem. 1.  Bennett now argues that "[w]here a federal court has jurisdiction by virtue of a federal question, the federal common law of privileges applies and is not abrogated by the presence of claims under state law." Id. at 4.  In particular, Bennett suggests that, because she has asserted a claim under the federal EMTALA statute and neither federal common law nor federal statutory law recognize a "peer-review privilege," Dr. Dinwoodie should be compelled to respond to Bennett's deposition questions.  Id. at 4, 12.

### (A)  The Emergency Medical Treatment and Active Labor Act

To address plaintiff's contention regarding the applicability of federal privilege law in this case, the Court begins with plaintiff's claims made under federal law.  EMTALA was enacted in 1986 to respond to a national concern that hospitals avoided treating uninsured and/or indigent patients, generally by transferring them to another hospital, often a "charity institution."  Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1136 (8th Cir. 1996) (purpose of EMTALA is "to address a distinct and rather narrow problem - the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to

---

[2] Although the Court could treat this argument as waived because Bennett did not present it to the magistrate judge, see Borden v. Sec'y of Health and Human Serv., 836 F.2d 4, 6 (1st Cir. 1987), because the other side has raised no objection thereto, the Court will proceed to decide the plaintiff's appeal on the merits.

treat them.").

Under EMTALA, _all_ emergency room patients, regardless of insurance coverage or economic status, are entitled to "appropriate" medical screening and stabilization before they may be transferred or discharged. 42 U.S.C. § 1395dd(a) and (b). A patient who presents at an emergency room for medical assistance must receive an examination to determine whether the patient suffers from an "emergency medical condition"[3] that, without "immediate medical attention," could reasonably be expected to place the patient's health in "serious jeopardy" or cause serious impairment to bodily functions or dysfunction of any organ or body part. 42 U.S.C. § 1395dd(e). If it is determined that the patient suffers from an "emergency medical condition," the hospital is required to provide further examination and treatment to the patient in order to stabilize him or her. 42 U.S.C. § 1395dd(b). A patient who has not been stabilized may not be transferred or discharged unless he or she refuses treatment or requests such a transfer in writing; a physician certifies that the benefits from the transfer outweigh the risks; or no physician is physically present in the emergency room at the time the patient is transferred. 42 U.S.C. § 1395dd(c)(1). In the event a hospital violates the mandates of EMTALA, it is subject to civil money

---

[3]

The provisions of EMTALA also apply to women in labor.

penalties, 42 U.S.C. § 1395dd(d)(1) and private rights of action, 42 U.S.C. § 1395dd(d)(2).

EMTALA does not provide a definition of what constitutes "appropriate" medical screening, but legislative history indicates that Congress was primarily concerned that patients were either not treated at all, or that they were transported in unstable condition. <u>Summers v. Baptist Med. Ctr. Arkadelphia</u>, 91 F.3d at 1136 ("The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.  The Committee is most concerned that medically unstable patients are not being treated appropriately.")(quoting H.R.Rep. No. 241(1), 99th Cong., 1st Sess., Part I at 27 (1985) reprinted in 1986 U.S.S.C.A.N. 42, 605).

Courts which have addressed the issue of what constitutes "appropriate treatment" of an emergency room patient agree that "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients <u>and provides that level of screening uniformly to all those who present substantially similar complaints</u>." <u>Correa v. Hosp. San Francisco</u>, 69 F.3d 1184, 1192 (1st Cir. 1995)(emphasis added).  The essence of an EMTALA claim is that the plaintiff-patient is treated differently from the way

other similarly situated patients are treated. <u>Correa v. Hosp. San Francisco</u>, 69 F.3d at 1192 (EMTALA requires that "there be some screening procedure, and that it be administered even-handedly"); <u>Summers</u>, 91 F.3d at 1138 (collecting cases) ("An inappropriate screening examination is one that has a disparate impact on the plaintiff.")

While rejecting a patient for lack of medical insurance would constitute a violation of EMTALA, the statute mandates "appropriate" medical screening examination for "<u>any</u> individual." 42 U.S.C. § 1395dd(a)(emphasis added).  EMTALA, however, does not provide a basis for a federal malpractice claim, nor does it provide a "national emergency health care standard."  <u>Correa</u>, 69 F.3d at 1192 ("EMTALA does not create a cause of action for medical malpractice . . . faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.") (citation omitted); <u>Summers</u>, 91 F.3d at 1138 (hospital itself to determine its screening procedures, which must then be applied equally to all individuals); <u>Vickers v. Nash Gen. Hosp., Inc.</u>, 78 F.3d 139, 143 (4th Cir. 1996)("Act does not provide a cause of action for routine charges of misdiagnosis or malpractice"); <u>Feighery v. York Hosp.</u>, 59 F. Supp. 2d 96, 102 (D. Me. 1999)(hospital is not required "to provide a uniform minimum level of care" and does not provide "a private cause of action . . . for misdiagnosis or improper medical treatment").

Instead, "claims of misdiagnosis or inadequate treatment are left to the state malpractice area". Summers, 91 F.3d at 1137.

The First Circuit has established the following elements for an EMTALA claim:

> "(1) the hospital is a participating hospital[4], covered by EMTALA, that operates an emergency department (or an equivalent treatment facility);
>
> (2) the patient arrived at the facility seeking treatment; and
>
> (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition."

Correa, 69 F.3d at 1190 (citing Miller v. Medical Ctr. of S.W. La., 22 F.3d 626, 628 (5th Cir.1994); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir.1990)).

**(B)  Application of State Law Privilege in Federal Court**

Pursuant to Federal Rule 26, the scope of discovery is limited to "any nonprivileged matter that is relevant to any party's claim

---

[4]

A "participating hospital" is defined as "a hospital that has entered into a [Medicare] provider agreement." 42 U.S.C. § 1395dd(e)(2).

or defense." Fed. R. Civ. P. 26(b)(1) (emphasis added).
Generally, privilege claims in federal question cases in federal
court are governed by Fed. R. Evid. 501[5]. <u>See e.g.</u> <u>Gilbreath v.</u>
<u>Guadalupe Hosp. Found., Inc.</u>, 5 F.3d 785, 791 (5th Cir.
1993)(holding that, in federal cases, party's right to assert a
privilege is "dictated by federal law"); <u>Everitt v. Brezzel</u>, 750 F.
Supp. 1063, 1066 (D. Colo.1990)("Where federal law provides the
governing substantive law in a lawsuit, the federal common law of
privileges will govern."). Nevertheless, Rule 501 also provides
for the application of state law privilege "with respect to an
element of a claim or defense as to which State law supplies the
rule of decision." Fed. R. Evid. 501; see <u>Gill v. Gulfstream Park</u>
<u>Racing Ass'n., Inc.</u>, 399 F.3d 391, 401 (1st Cir. 2005); 8 Charles
Alan Wright et al., <u>Federal Practice and Procedure</u> § 2016, at 224
(2d ed. 1994).

---

[5]

Fed. R. Evid. 501 provides as follows:

Except as otherwise required by the Constitution of the United
States or provided by Act of Congress or in rules prescribed by the
Supreme Court pursuant to statutory authority, the privilege of a
witness, person, government, State, or political subdivision
thereof shall be governed by the principles of the common law as
they may be interpreted by the courts of the United States in the
light of reason and experience. <u>However, in civil actions and
proceedings, with respect to an element of a claim or defense as to
which State law supplies the rule of decision, the privilege of a
witness, person, government, State, or political subdivision
thereof shall be determined in accordance with State law</u> (emphasis
added).

The issue is less clear in cases that include federal question claims as well as state law claims. The Supreme Court has acknowledged that "there is disagreement concerning the proper rule in cases. . . in which both federal and state claims are asserted in federal court and relevant evidence would be privileged under state law but not under federal law," but it declined to decide the issue because it had not been raised and was not necessary for the resolution of the case. Jaffee v. Redmond, 518 U.S. 1, 17 n. 15, 116 S.Ct. 1923,1932, 135 L.Ed.2d 337 (1996). See Guzman v. Mem. Hermann Hosp. Sys., 2009 WL 427268 at *3 (S.D. Tex. Feb. 20, 2009)(acknowledging that issue of what privilege law should apply in federal question cases with supplemental state law claims remains unresolved).

The substance of Bennett's claim is that the defendants "violated the applicable standards of care when they failed to perform an adequate medical screening evaluation and examination of Ms. Hall" and that, as a result, Hall's subarachnoid hemorrhage was not discovered in time for surgical intervention. Pl.'s Mem. 3. As such, the claim is clearly based on state law and, although Bennett insists that her inclusion of an EMTALA claim mandates the application of federal privilege law, such assertion is directly controverted by Rule 501, which requires the application of state privilege law to "an element of a claim or defense as to which State law supplies the rule of decision." Fed. R. Evid. 501.

In determining whether a federal court should recognize a state evidentiary privilege pursuant to Fed. R. Evid. 501, the First Circuit has established a two-part test. In re Hampers, 651 F.2d 19, 22 (1st 1981).   First, the Court must determine whether the state would recognize the privilege asserted by the party resisting recovery.   In re Hampers, 651 F.2d at 22.   Second, the Court must determine whether the asserted privilege is "'intrinsically meritorious in [its] independent judgment.'" Id. at 22-23 (quoting ACLU of Miss. v. Finch, 638 F.2d 1336 (5th Cir. 1981)).   To determine the merit of the privilege, the Court examines whether (1) the communications originated with the expectation of nondisclosure; (2) confidentiality is essential to maintaining the relationship between the parties; (3) the relationship is vital and should be fostered; and (4) "the injury that would inure to the relation by the disclosure of the communications (would be) greater than the benefit thereby gained for the correct disposal of litigation." In re Hampers, 651 F.2d at 23 (following Finch in adopting four tests of Wigmore).

   (C)   The Rhode Island Peer-review Privilege

   The Rhode Island Supreme Court has declared that "certain privileges are recognized because they are deemed to serve such a vitally important public good that 'transcend[s] the normally predominant principle of utilizing all rational means for ascertaining truth.'" Pastore v. Sampson, M.D., 900 A.2d, 1067

14

1074 (R.I. 2006)(acknowledging "the social importance of 'open discussions and candid self-analysis in peer-review meetings to ensure that medical care of high quality will be available to the public'")(quoting Moretti v. Lowe, 592 A.2d 855, 857 (R.I. 1991)); State v. Almonte, 644 A.2d 295, 298 (R.I. 1994)(Privileges are designed to protect "interests and relationships . . . of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.")(quoting McCormick's Handbook of the Law of Evidence §72 at 152 (Cleary 2d ed. 1972)).

The peer-review privilege applicable to health care providers is set forth in two separate Rhode Island statutes, which, together, establish a privilege for the proceedings and records of peer-review boards. Pastore v. Sampson, M.D., 900 A.2d at 1074-75.

Section 23-17-25(a) provides that, with certain exceptions, "[n]either the proceedings nor the records of peer review boards as defined in § 5-37-1 shall be subject to discovery." R.I. Gen. Laws § 23-17-25(a). The privilege does not apply to any information related to restrictions imposed on a physician for unprofessional conduct; regular hospital business records; or documents otherwise available from original sources. Id.; Pastore, 900 A.2d at 1076 (A physician is required to disclose whether his staff privileges had ever been "restricted, revoked, or curtailed.")(citation omitted); Moretti v. Lowe, 592 A2d 855, 858 (R.I. 1991)(Privilege "does not

render immune information otherwise available from original sources even if the information was presented at a peer-review committee meeting.").

Section 5-37.3-7(c) provides that "the proceedings and records of medical peer-review boards shall not be subject to discovery or introduction into evidence." R.I. Gen. Laws § 5-37.3-7 (c). In addition, any person who attends a medical peer-review meeting is precluded from testifying "as to any matters presented during the proceedings of that board or as to any findings, recommendations, evaluations, opinions, or other actions of that board or any members of the board." <u>Id.</u>

Under the peer-review privilege, a hospital is entitled "to withhold 'all records and proceedings' before the peer-review board, even those pertaining to the plaintiff in that case." <u>Pastore</u>, 900 A.2d at 1076 (quoting <u>Cofone v. The Westerly Hospital</u>, 504 A.2d 998, 1000 (R.I. 1986)). "The burden of establishing entitlement to nondisclosure rests on the party resisting discovery," <u>Pastore</u>, 900 A.2d at 1076, and the statutes creating the peer-review privilege are to be strictly construed. <u>Moretti v. Lowe</u>, 592 A.2d at 857.

(D) **The Deposition Testimony**

Discovery in federal court is subject to the limitations of Federal Rule 26, which requires that the evidence sought is "nonprivileged" and "<u>relevant</u> to any party's claim or defense."

16

Fed. R. Civ. P. 26(b)(1)(emphasis added).   However, "a party seeking broader discovery 'of any matter relevant to the subject matter involved in the action,' is required to show good cause to support the request." <u>In re Subpoena to Witzel</u>, 531 F.3d 113, 118 (1st Cir. 2008).

The First Circuit has not addressed the question of whether a state peer-review privilege applies in a case asserting EMTALA and state law claims.   However, under the test established by the First Circuit in <u>Hampers</u>, it is clear that Rhode Island has recognized the medical peer-review privilege and that the expected confidentiality with respect to the proceedings is essential to the integrity of the peer-review process.   What is left for this Court to decide is whether, under the circumstances of this case, the disclosure of the requested information would outweigh the benefit "gained for the correct disposal of litigation."   <u>In re Hampers</u>, 651 F.2d at 22-23.

Bennett's complaint asserts a federal question claim under EMTALA against Kent and state negligence claims against Dr. Quas as well as the other defendants.   While federal law provides the rule of decision in the EMTALA claim, the negligence claims are subject to Rhode Island state law.   From the pleadings, it appears that the essence of this case lies in medical malpractice, specifically, the alleged failure of the attending physician to order a CAT scan during the decedent's initial visit to the Kent emergency room.

17

Kent's liability under EMTALA attaches only if Hall was not afforded appropriate screening to detect an emergency condition and/or she was discharged while she was medically unstable. Correa, 69 F.3d at 1190. To support her EMTALA claim, Bennett will have to show that Dr. Quas failed to administer medical tests to Hall or provide her with care that he deemed necessary for Hall's diagnosis or treatment and that he had, or would have, administered such tests to other patients exhibiting the same or similar symptoms as Hall. In other words, Bennett must demonstrate that Hall received disparate treatment when compared to treatment received by other, similarly situated patients. Bennett now seeks to discover from the Director of the Kent E.D. whether treatment of Hall by Dr. Quas met Kent E.D. standards. This Court concludes that the information Bennett seeks to elicit from Dr. Dinwoodie is irrelevant with respect to her EMTALA claim. If Dr. Quas was in error and failed to order a particular test, that may well give cause for a negligence claim against him, but it does not establish a basis for an EMTALA claim. Moreover, whether the decision not to perform a CAT scan on Hall was the result of mistake or neglect is a fact that may be established by Hall's medical records which have been made available to Bennett. Dr. Dinwoodie's response to Bennett's deposition question will not provide additional information relevant to the EMTALA claim. Whether, in Dr. Dinwoodie's opinion, Dr. Quas adhered to the established standard

of care in his treatment of Hall is relevant only to Bennett's medical malpractice claim, and as such, it is protected by the Rhode Island peer-review privilege.

Consequently, where, as here, the information sought is relevant only to plaintiff's state law claims, the assertion of a claim under EMTALA does not serve to countermand the state law privilege applicable to the state negligence claims. To preclude Kent from asserting the peer-review privilege in this case would jeopardize the confidentiality necessary for the peer-review process without assisting the plaintiff in prosecuting her EMTALA claim.[6]

### Conclusion

For the foregoing reasons, Magistrate Judge Almond's order denying plaintiff's motion to compel is affirmed and the plaintiff's appeal is denied and dismissed.


SO ORDERED:


_Mary M. Lisi_
Mary M. Lisi
Chief United States District Judge
Date: June  _10_  , 2009


---

[6]
Because this Court resolves Bennett's motion based on application of the peer-review privilege, it need not address Kent's argument regarding compelled expert testimony.

19